163 F.3d 647
 333 U.S.App.D.C. 356
 John W. HINCKLEY, Jr., Appellant
v.
UNITED STATES of America, Appellee
 No. 97-3183.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Nov. 6, 1998.
Decided Jan. 15, 1999.
 
 Appeal from the United States District Court for the District of Columbia (No. 81cr00306-01).
 Barry Wm. Levine argued the cause for appellant. With him on the briefs was Adam Proujansky. John T. Kotelly entered an appearance.
 Thomas C. Black, Assistant United States Attorney, argued the cause for appellee. With him on the brief were Wilma A. Lewis, United States Attorney, John R. Fisher, Robert R. Chapman and Thomas E. Zeno, Assistant United States Attorneys. Thomas J. Tourish, Jr. and Helen M. Bollwerk, Assistant United States Attorneys, entered appearances.
 John M. Ferren, Corporation Counsel, Charles L. Reischel and Janet L. Maher, Deputy Corporation Counsels, were on the brief for amicus curiae District of Columbia.
 Before: WALD, WILLIAMS and HENDERSON, Circuit Judges.
 Opinion for the Court filed by Circuit Judge WALD.
 Dissenting Opinion filed by Circuit Judge HENDERSON.
 WALD, Circuit Judge:
 
 
 1
 In early December 1997, St. Elizabeths Hospital ("Hospital") in Washington, D.C., filed a letter notifying the district court that it had approved a supervised six-hour outing for John W. Hinckley, Jr., an insanity acquittee, to eat a holiday dinner with his parents and a companion on December 29, 1997, in a designated private home. The Hospital planned to transport Hinckley in a hospital van, in the custody of two Hospital employees, to the private home, where he would remain in the line of sight of a Hospital escort at all times.[1] The United States Attorney opposed this plan and asked the district court to hold a hearing under D.C.Code § 24-301(e), which requires a hearing when the Hospital proposes the "conditional release" of an insanity acquittee and the United States objects to it. Hinckley argued that the outing was not a "conditional release" under the statute and that the district court had no jurisdiction to approve or reject the supervised visit.[2] The district court ruled that the visit was a "conditional release" and held the statutorily prescribed de novo hearing under section 301(e) to determine whether Hinckley's condition "warrants his conditional release ... under such conditions as the court shall see fit." D.C.Code § 301(e). On December 15, 1997, the district court found Hinckley not eligible for conditional release.
 
 
 2
 The sole question we decide on this appeal is whether the proposed six-hour outing in the company of Hospital employees is in fact a "conditional release" within the meaning of section 301(e) over which the district court has jurisdiction to approve or reject.[3] We conclude that it is not and accordingly vacate the judgment of the district court.
 
 I.
 
 3
 Hinckley attempted to assassinate then-President Ronald Reagan on March 30, 1981, in the driveway of the Washington Hilton Hotel. He shot and wounded the President, as well as Presidential Press Secretary James Brady, Secret Service Agent Timothy McCarthy, and Metropolitan Police Officer Thomas Delahanty. During his criminal trial, Hinckley presented evidence that he suffered from a mental disease at the time of the attack, and a jury subsequently found him not guilty by reason of insanity. He was committed in 1982 to St. Elizabeths Hospital, where he has remained in residence ever since. The District of Columbia statute under which Hinckley was committed, D.C.Code § 24-301, establishes the circumstances in which insanity acquittees can be "unconditionally" or "conditionally" released from the hospital. Specifically, section 301(e) provides that the district court in which a patient was tried and committed must approve or reject the Hospital's certified recommendation that the patient be "conditionally released under supervision." The court can hold a hearing on the matter sua sponte if it so chooses, but it must hold a hearing if the government prosecutor objects to the proposal.
 
 
 4
 In 1987, the Hospital filed notice with the district court under section 301(e) that it proposed to grant Hinckley a conditional release, in the form of an outing off Hospital grounds unaccompanied by Hospital personnel, as part of his continuing therapy. The Hospital subsequently withdrew this plan when a court-ordered search of Hinckley's room turned up evidence which Hinckley had apparently concealed from his therapists, representing, in the opinion of Hospital officials, symptoms of a continuing and potentially dangerous illness.[4] After the Hospital withdrew its 1987 notification, the Hospital and the United States Attorney entered into a "Stipulation," whereby the Hospital agreed to provide two weeks' written notice to the district court, the United States Attorney, and Hinckley's lawyer any time the Hospital proposed to release Hinckley "from the grounds of St. Elizabeths Hospital accompanied by Hospital personnel." J.A. at 77. In 1988, the Hospital notified the district court, pursuant to the 1987 Stipulation, that it planned to grant Hinckley a half-day off-campus visit in the custody of Hospital staff. This was also withdrawn after the Hospital and the United States Attorney's office discovered more evidence that his clinical status had improved less than the Hospital originally thought. J.A. at 309-11.
 
 
 5
 Not until December of 1997 did the Hospital again propose to allow Hinckley off Hospital grounds--again, only for a brief social visit with his parents (and a companion) in the custody of Hospital staff. St. Elizabeths' Hospital Review Board, which issues conditional release certifications under section 301(e), decided that such a supervised visit was the next appropriate step in Hinckley's therapy because he has lived in a minimum security ward at the Hospital since 1992 and travels the Hospital grounds without escort.[5] This visit requires a "B-City" pass because it is a "Class B" privilege, see footnote 5, involving excursions off Hospital grounds under Hospital supervision. See FINAL NIMH REPORT, at 87. In compliance with the Stipulation, on December 2, 1997, the Review Board submitted a letter to the court and the United States Attorney's office notifying them that Hinckley would be allowed to have a holiday visit on December 29, 1997, off Hospital grounds, with family members and his long-time girlfriend in a private home for up to six hours accompanied at all times by Hospital staff.
 
 
 6
 The United States requested a hearing, after which the district court barred the Hospital's planned visit, holding that the outing was a conditional release under section 301(e) and concluding that "the Court cannot find by a preponderance of the evidence that Mr. Hinckley will not be a danger to himself or others should he be permitted to cross the boundary of St. Elizabeths Hospital under the proposal before the Court, even in the company of Hospital staff." United States v. Hinckley, 984 F.Supp. 35, 37 (D.D.C.1997) (Hinckley II).[6]II.
 
 
 7
 The government[7] argues that this appeal is now moot because the proposed visit was scheduled for December 29, 1997, a date long since passed so that this court could grant no meaningful relief. We conclude, however, that the "B-City" pass at issue here falls within the exception to the mootness doctrine for cases that are "capable of repetition, yet evading review." Murphy v. Hunt, 455 U.S. 478, 482, 102 S.Ct. 1181, 71 L.Ed.2d 353 (1982) (citation and quotation omitted).
 
 
 8
 In so concluding we rely on this court's decision in Friend v. United States, 388 F.2d 579 (D.C.Cir.1967), in which we held that a revocation of a conditional release, which had been appealed, was not rendered moot when another conditional release was issued during the appeal. See id. at 581. Since the record showed that there would likely be only brief periods of time in which a revocation would be in effect for this patient before another conditional release was issued, we found that the challenged revocation order was so short in duration as to evade review. See id. The District of Columbia Court of Appeals has applied Friend to a case identical to this one. See Shuler v. United States, 422 A.2d 996, 997 (D.C.1980) (court's review of a holiday conditional release after the holiday has passed is not blocked because " '[t]he issue as to the proper construction of section 301(e) is continuing and of public importance, and review is not precluded by mootness' "), quoting Friend, supra.
 
 
 9
 Applying the capable of repetition but evading review standard to this case, if there is "a reasonable likelihood that [Hinckley] will again suffer the deprivation ... that gave rise to this suit," Honig v. Doe, 484 U.S. 305, 318, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988), his case is capable of repetition. Hospital doctors have indicated that Hinckley's psychotic disorder and major depression are in remission, but that he still suffers from narcissistic personality disorder. See J.A. at 249 (1996 Clinical Record). This fact, combined with the nature and notoriety of his assassination attempt, make it abundantly clear that Hinckley faces a lengthy stay at St. Elizabeths Hospital. We can safely conclude as well, based on the parties' representations in briefs and at argument, that Hinckley's clinical status has not changed since the summer of 1996 and, that his doctors are likely to continue recommending "B-City" passes as the next appropriate step in his therapy. See Gannett Co. v. DePasquale, 443 U.S. 368, 377, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979) (publisher of two New York newspapers is reasonably expected to be subject to closure orders similar to the one the newspaper is challenging because of the nature of its business); Jenkins v. Squillacote, 935 F.2d 303 (D.C.Cir.1991) (7-year-old disabled public school student reasonably likely again to face placement in another school and lodge an objection). Indeed, if that is their professional opinion, they are bound to do so. The government admitted as much in its brief. See Appellee's Brief at 28. Thus, the proposed issuance of a "B-City" pass to Hinckley is eminently capable of repetition.
 
 
 10
 The normal process for planning a "B-City" outing is also of such short duration that it could well evade review. The 1987 Stipulation requires the Hospital to provide only two weeks' notice before a scheduled outing--hardly enough time under normal court scheduling for fullscale judicial review and possible approval of the plan. The government argues that the Hospital could eliminate the risk that future visits would evade review by proposing an outing without any specific time constraints and agreeing that if the outing is approved it would be scheduled for two weeks after a final court ruling. In response, counsel for the Hospital said at oral argument that the Hospital does occasionally draw up long-term plans, for a period of a year or more, in which patients are granted periodic "B-City" outings, but did not indicate whether such a long-term plan would be feasible for Hinckley. The record before us and the tortured legal history surrounding his commitment does not suggest that the Hospital would approve open-ended visits for Hinckley without time constraints or particularized approval by the Hospital Review Board. The government itself argues that the terms under which Hinckley should be able to leave the Hospital grounds are "highly fact specific," Appellee's Brief at 28, depending on Hinckley's current condition and the details of the outing that is proposed. In fact, prior to the Hospital's approval of this supervised visit, the Hospital rejected a more extensive open-ended plan that would have allowed Hinckley to visit with his parents, without the presence of Hospital staff, for 12 hours at a time once every month. In similar circumstances, we have advocated a commonsense reading of the record to decide whether the issue before us evades review, concluding that it may do so, even where there is no assurance that time constraints will always preclude review. See, e.g., Christian Knights of the Ku Klux Klan Invisible Empire, Inc. v. District of Columbia, 972 F.2d 365 (D.C.Cir.1992) (city decision regarding a permit for a march evades review when the decision is likely to be issued 15 days before the event and safety concerns are likely to arise even later); Washington Post v. Robinson, 935 F.2d 282 (D.C.Cir.1991) (sealing of a plea agreement evades review in part because of importance of public access to court proceedings, even though a sealing order might stay in effect for a long period).
 
 
 11
 Finally, "both Supreme Court and circuit precedent hold that orders of less than two years' duration ordinarily evade review." Burlington N. R.R. Co. v. STB, 75 F.3d 685, 690 (D.C.Cir.1986), citing Southern Pac. Terminal Co. v. ICC, 219 U.S. 498, at 514-16, 31 S.Ct. 279, 55 L.Ed. 310 (1911); In re Reporters Comm. for Freedom of the Press, 773 F.2d 1325, 1329 (D.C.Cir.1985). Even if the Hospital were to fashion a long-term "B-City" plan for Hinckley, the plan is not likely to cover a two-year period nor to be submitted two years in advance.[8] Accordingly, we find that this case is "capable of repetition yet evading review."
 
 III.
 
 12
 We turn then to the crux of the appeal, the statutory question of whether section 301(e) applies to off-grounds therapeutically approved visits into the community in the custody of Hospital personnel. Hinckley argues that anyone "conditionally released under supervision" in section 301(e) so as to require court approval must be a person who is released from the custody of the Hospital; and since Hinckley is to remain in the custody of the Hospital for this visit, he will not be conditionally released and no judicial review or approval is required under the statute. The government contends that the phrase "conditionally released" under section 301(e) refers to release from the Hospital's boundaries and thus applies to any visit off-grounds. One thing seems clear: the term "conditionally released under supervision," standing alone, does not yield a "plain meaning" that must be "enforce[d] [ ] according to its terms," Caminetti v. United States, 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917), and we must resort to legislative history and statutory context to divine its meaning.
 
 A. Statutory Construction
 
 13
 Section 24-301 of the District of Columbia Code governs the commitment and release of criminal defendants who are found to be insane. In particular instances, it vests supervisory powers in the judiciary over patients' ingress to and egress from St. Elizabeths. As the District of Columbia Court of Appeals has observed, "[T]his jurisdiction has concluded legislatively that the judiciary is best suited to performing 'the value-weighing function of balancing the unpredictable risks to individual liberty and public safety' posed by the release decision." DeVeau v. United States, 483 A.2d 307, 311 (D.C.1984) (quoting Joseph Goldstein & Jay Katz, Dangerousness and Mental Illness: Some Observations on the Decision to Release Persons Acquitted by Reason of Insanity, 70 YALE L.J. 225, 237 (1960)). Sections 301(a) and (b) address the judiciary's role in determining a defendant's competency to stand trial. See D.C.Code § 24-301(a)-(b). Section 301(c) provides that when a jury finds a defendant not guilty but insane, it must say so specifically. See id. § 301(c). We focus on the next two sections of the statute in determining the meaning of "conditional release."[9]
 
 
 14
 Section 301(d)(1) provides for the automatic commitment to the Hospital of a person acquitted on a verdict of insanity. See id. § 301(d)(1). Subsection 301(d)(2)(A) further states: "A person confined pursuant to paragraph (1) of this subsection shall have a hearing, unless waived, within 50 days of his confinement to determine whether he is entitled to release from custody." Id. § 301(d)(2)(A) (emphasis added). At the hearing, "[t]he person confined shall have the burden of proof. If the court finds by a preponderance of the evidence that the person confined is entitled to release from custody, either conditional or unconditional, the court shall enter such order as may appear appropriate." Id. § 301(d)(2)(B) (emphasis added). The words "confined," "confinement," "custody," and "release" are nowhere defined. We can safely suppose, though, that "confinement" is roughly the opposite of "release from custody" because of the way the terms are juxtaposed in the statute--e.g., a "person confined is entitled to release from custody." Under this statute, "custody" is that from which a "confined" person is released. It follows that if we place "release" and "confinement" at different ends of the spectrum, with release denoting freedom and confinement denoting no freedom, then "custody" should be placed on the spectrum much nearer to "confinement" than to "release."
 
 
 15
 Section 301(e) sets forth the procedure for granting a patient committed under this statute an unconditional or conditional release, and it presents the same juxtaposition between "confined" and "released." It begins: "Where any person has been confined in a hospital for the mentally ill pursuant to subsection (d) of this section," the Hospital superintendent may determine that the person is "entitled to his unconditional release from the hospital." Id. § 301(e) (emphasis added). For conditional releases, section 301(e) provides, in relevant part:
 
 
 16
 Where, in the judgment of [the Hospital] superintendent ..., a person confined under subsection (d) of this section is not in such condition as to warrant his unconditional release, but is in a condition to be conditionally released under supervision, and such certificate is filed [with the clerk of the court in which the person was tried] and served [on the United States Attorney], such certificate shall be sufficient to authorize the court to order the release of such person under such conditions as the court shall see fit at the expiration of 15 days from the time such certificate is filed and served pursuant to this section; provided, that the provisions as to hearing prior to unconditional release shall also apply to conditional releases, and, if after a hearing and weighing the evidence, the court shall find that the condition of such person warrants his conditional release, the court shall order his release under such conditions as the court shall see fit, or, if the court does not so find, the court shall order such person returned to such hospital.
 
 
 17
 Id. § 301(e) (emphasis added). The hearing provisions made applicable to conditional releases are as follows:
 
 
 18
 ... the court in its discretion may, or upon objection of the United States ... shall, after due notice, hold a hearing at which evidence as to the mental condition of the person so confined may be submitted, including the testimony of 1 or more psychiatrists from said hospital.
 
 
 19
 Id. § 301(e). Finally, section 301(k) provides a habeas-type mechanism for acquittees to challenge the terms of their commitment: "A person in custody or conditionally released from custody ... may move the court having jurisdiction to order his release, to release him from custody, to change the conditions of his release, or to grant other relief." Id. § 301(k) (emphasis added). In sum, sections 301(e) and (k) continue the usage of "release" as a counterpart to "custody" and "confinement."
 
 
 20
 Assuming, as we do, that these terms are used consistently throughout the text, cf. Atlantic Cleaners & Dyers, Inc. v. United States, 286 U.S. 427, 433, 52 S.Ct. 607, 76 L.Ed. 1204 (1932), quoted in United States v. Thompson, 452 F.2d 1333, 1345 (D.C.Cir.1971) (the "natural presumption that identical words used in different parts of the same act are intended to have the same meaning" yields when "there is such variation in the connection in which the words are used as reasonably to warrant the conclusion that they were employed in different parts of the act with different intent"), we surmise from the statute that a person who is conditionally released under section 301(e) is no longer confined nor in the Hospital's custody. We also observe that Congress did not indicate the terms "custody," "confinement" and "release" are to be construed in other than their ordinary sense, see Palestine Information Office v. Shultz, 853 F.2d 932, 937 (D.C.Cir.1988), so we can derive some guidance from the dictionary. To "confine" is "a: to keep in narrow quarters: imprison" and "b: to prevent free outward passage or motion of." WEBSTER'S THIRD NEW INT'L DICTIONARY 476 (1976). "Custody" similarly betokens restraint but it is a more specific form of it: custody is defined as "a: the act or duty of guarding and preserving." Id. at 559. It is clear, then, that one who is "released" under this statute--"set free from restraint [or] confinement," id. at 1917--is no longer under the restraint of custody nor confined in his movement.[10]
 
 
 21
 The cornerstone of our dissenting colleague's argument is that under this plan, Hinckley will in fact be "released," i.e., set or made free, when he travels in a Hospital van under the constant supervision of Hospital staff for a six-hour visit. See Dissent at 657. While asserting that "[i]t cannot be disputed that if Hinckley is allowed the proposed visit he will be freed," the dissent also concedes that Hinckley's so-called freedom would come with "the stipulations that he return to the Hospital the same day and that he be accompanied by Hospital staff during the visit." Id. at 657. We candidly do not see how such a visit under Hospital escort is tantamount to being "set free" with "conditions." "Conditional" cannot modify "release" so as to obliterate the ordinary meaning of "release" altogether. As is true of other patients allotted "B-City" passes, Hinckley would at all times be confined to the presence of Hospital personnel and subject to any restraint they deemed necessary on his freedom of movement during this outing; if anything he would be more restrained than he currently is on Hospital grounds, where he moves freely without escort. The mere fact that he is allowed to leave the confines of the Hospital plant under such restraints does not mean in any legal or practical sense that he has been released from "custody" and "confinement."
 
 
 22
 B. Case Law Addressing Section 301 and "Conditional Release"
 
 
 23
 Hough v. United States, 271 F.2d 458 (D.C.Cir.1959), the only case that addresses the meaning of "conditional release" under section 301, bolsters the point that "conditional release from custody" or "confinement," as used variously throughout the statute, means conditional release from Hospital guard or restraint.
 
 
 24
 In Hough, this court answered the question of whether an individual committed under section 301 could be permitted, without judicial approval, to leave the Hospital grounds on his own without a guard or attendant. We answered "no" and held that such an off-grounds visit was a "conditional release" under section 301(e). While cautioning that a person committed for treatment is not a "prisoner," we said:
 
 
 25
 It does not follow, however, that the hospital authorities are free to allow such a patient to leave the hospital without supervision.... [T]he statute makes one in appellant's situation a member of "an exceptional class of people." It provides, generally, that the District Court have a voice in any termination of her confinement, whether unconditional or conditional.
 
 
 26
 Although the statute does not speak of temporary leaves from the hospital, its purpose, as we read it, is to assure that members of the "exceptional class" to which appellant belongs be kept under hospital restraint until the District Court, in the exercise of a discretion, reviewable by this Court, approves a relaxation of that restraint. We read "conditional release" as used in the present statute to include the kind of temporary freedom which has been given this appellant.
 
 
 27
 Hough, 271 F.2d at 462 (citation omitted) (emphasis added). Despite Hough's unequivocal reliance on "restraint" as the touchstone for deciding whether a patient has been conditionally released, the government, citing dictum in another case, United States v. Ecker, 543 F.2d 178 (D.C.Cir.1976), asks us to expand Hough to hold that an off-campus visit with two Hospital escorts is also a "conditional release" under the statute. In Ecker, we held that a district court reviewing the Hospital's certificate for conditional release under section 301(e) must employ a de novo standard of review; we were not presented, as we were in Hough, with the meaning of conditional release. Although we referred to a patient's "cross[ing] the hospital boundary" as the point at which a court stops deferring to the Hospital's judgment, we also quoted Hough's pronouncement that the presence of Hospital restraint determines whether a patient has been conditionally released. Id. at 186. Ecker thus represents no persuasive authority at all for the principle that a patient has been released from custody when he leaves the Hospital grounds with a Hospital escort.
 
 
 28
 So, given that Hough stands only for the proposition--at most--that a patient's unrestrained release into the community is a conditional release, we conclude that prior case law, together with the syntactical usage of "custody" and "confinement" in the statute, compel the conclusion that a patient's off-campus visit with Hospital escorts (a "B-City" pass) is not a conditional release under section 301. This has certainly been the uniform assumption of every court in the District of Columbia--not to mention the government and the Hospital, discussed more fully below--that has ever considered a patient's motion for conditional release, a Hospital's certification of conditional release, or a revocation of conditional release. See, e.g., Ecker, 543 F.2d at 181; United States v. McNeil, 434 F.2d 502, 505 (D.C.Cir.1970) (Bazelon, J., concurring); Friend, 388 F.2d at 579 (D.C.Cir.1967); Darnell v. Cameron, 348 F.2d 64, 65 (D.C.Cir.1965); Jackson v. United States, 641 A.2d 454, 456 (D.C.1994); DeVeau, 483 A.2d at 310 n. 4; United States v. Charnizon, 232 A.2d 586, 587 (D.C.1967). The Hough court also expressly recognized the difference which we reiterate here between conditional releases and Hospital-accompanied off-campus excursions: it noted that the district court could "require that [the patient] be restricted to the hospital grounds, or, if outside the hospital grounds, in the custody or company of a hospital attendant until such a time as the court orders the conditional release of [the patient]." Hough, 271 F.2d at 460 (emphasis added).
 
 C. Legislative History of Section 301
 
 29
 The legislative history of section 301 adds weight to the notion that a "confined" patient is "released from custody" only when he is released from the Hospital's restraints or guard. The 1955 House Report indicates that lawmakers rewrote section 301 because under its predecessor, a person found not guilty by reason of insanity and committed to a mental hospital could be released solely on the basis of a certificate from the hospital superintendent. See 1955 HOUSE REPORT, at 13. Congress chose to place the District of Columbia in the ranks of the states, roughly half at the time, that required a court order to accomplish a release from a mental institution. Id. "It is the opinion of the Committee [ ] that once a person has been excused from his criminal act or acts by reason of insanity he be not thereafter released into society until it is reasonably certain that the person has recovered his sanity and is no longer dangerous to himself or others." Id. Thus, the public safety concerns that Congress addressed by involving the judiciary in the release of the criminally insane are implicated by the release of a patient into society and out of Hospital custody, and it is at that point where Hospital decisions end and court jurisdiction takes hold. See also DeVeau, 483 A.2d at 311 (judicial review under section 301(e) is to ensure that an acquittee "is well enough to reenter the community on a conditional or unconditional basis").[11]
 
 D. Past Practice and Procedure
 
 30
 Indeed, a demarcation line between a Hospital escort and supervision by some other third party in the community has signaled the point at which the requirements of conditional release come into play since conditional releases first became available for insanity acquittees in 1955. We disagree with our dissenting colleague that 43 years of unchallenged past practice is irrelevant in that respect. The very existence of the 1987 Stipulation--whose sole purpose is to require the Hospital to give notice when Hinckley will be off Hospital grounds--suggests that the government understood then that the Hospital would not otherwise have to give such notice for Hospital-accompanied visits. Moreover, after the Hospital was criticized in 1986 for allowing Hinckley to leave the grounds for a day with a Hospital escort, Congress in 1988 amended the Federal insanity defense law specifically to do what the District of Columbia law does not: to provide prospectively[12] for court supervision of all excursions by Federal insanity acquittees off Hospital grounds. See 18 U.S.C. § 4243(h); see also 133 CONG. REC. 16905 (statement of Rep. Gekas) (Hinckley's supervised outing "is when we first discovered that ... decisions for furloughs or off campus excursions ... from the hospital ... [are] subject only to the approval of the hospital mechanism that is in place").
 
 
 31
 Since October 1, 1996, Hospital staff have made 451 trips to D.C. General Hospital with eligible medium and maximum security patients on "B-City" privileges, as well as 56 other community visits to attend wakes, funerals, or special medical appointments at other facilities. See District of Columbia's (D.C.) Brief at 10-11. In the same period of time, the Hospital's Recreational Therapy Branch has taken minimum and medium security patients on 359 "B-City" privilege trips to museums, theaters, bowling alleys, arboretums, amusement parks, and shopping. The Hospital also takes groups of patients on trips--with a maximum ratio of one staff member for every five patients--four times per month. See id. & nn.8-9. Yet the government has not previously objected to any of these outings nor to the countless "B-City" passes issued before 1996. In response to a query at oral argument about whether the government would in the future seek to invoke court jurisdiction over all "B-City" passes, government counsel answered equivocally that there might be other situations in which the government thought court intervention would be necessary, based on concerns for public safety. But it seems to us that Congress has already struck a balance in the D.C. law between treatment for the criminally insane and the public safety by defining the juncture where court approval is necessary as the point of a patient's "reentry into society," not his stepping off Hospital grounds with a Hospital escort. See also DeVeau, 483 A.2d at 311 (judicial review under section 301(e) is to ensure that an acquittee "is well enough to reenter the community on a conditional or unconditional basis"). In addition, tort law provides strong incentive for the Hospital to make sure it is acting responsibly in issuing "B-City" privileges. See White v. United States, 780 F.2d 97, 103 (D.C.Cir.1986) (" 'One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm.' ") (quoting RESTATEMENT (SECOND) OF TORTS § 319 (1965)). A "B-City" privilege, in allowing the Hospital to monitor how the patient acts outside the Hospital while keeping the public safety firmly in mind by ensuring he is under Hospital control at all times, serves as a crucial precursor to a patient's reentry into larger society. FINAL NIMH REPORT, at 81 ("Therapeutic passes are [ ] symbolic of a forensic hospital's legitimate mission to rehabilitate its patients, as well as provide the security necessary to protect the public."); see also District of Columbia Dep't of Human Serv., Policy and Procedure, CMHS Policy 50000.330.1 (superseding St. Elizabeths Hospital Policy no. 3300.1A) (directing the Hospital to classify, "for security purposes, patients hospitalized pending or as a result of criminal proceedings"). For the first time, in a case involving perhaps the most notorious patient at the Hospital, the government now argues 43 years after section 301(e)'s enactment, that a "B-City" pass requires court approval. We do not believe it has made its case.
 
 CONCLUSION
 
 32
 We conclude that the Hospital's issuance of a "B-City" pass to Hinckley does not require the approval of the district court under section 301 because it is not a "conditional release under supervision." A conditional release under section 301(e) is a release from the Hospital's restraint and guard, and, as with all "B-City" passes, Hinckley will be guarded and his movement restrained by the Hospital's escorts, as well as by the limited nature of the outing. Accordingly, we vacate the judgment of the district court barring access to Hospital-approved "B-City" privileges in which he is accompanied by Hospital personnel.
 
 
 33
 So ordered.
 
 
 34
 KAREN LeCRAFT HENDERSON, Circuit Judge, dissenting:
 
 
 35
 Section 24-301 of the District of Columbia Code (section 301) requires that someone like appellant John W. Hinckley, Jr., who has been acquitted of a crime "solely on the ground that he was insane at the time of its commission, ... shall be committed to a hospital for the mentally ill until such time as he is eligible for release." § 301(d)(1). Subsection (e) specifies the circumstances under which a person so committed is entitled to "release from the hospital," either conditionally or unconditionally. A "conditional release" is authorized only on the hospital superintendent's certification that the patient "is in a condition to be conditionally released under supervision." § 301(e) (emphasis added). The certification must be filed with the court and served on the United States Attorney fifteen days before the proposed release. The court must then find "that the condition of such person warrants his conditional release" and issue an order directing "release under such conditions as the court shall see fit." § 301(e).[1] The district court held that the off-premises trip proposed for Hinckley--a six-hour visit with his parents and a friend at a private house accompanied by staff from St. Elizabeths Hospital (St. Elizabeths or Hospital)--is a conditional release "sufficient to trigger the safeguards of judicial review pursuant to 24 D.C.Code § 301(e)." United States v. Hinckley, 984 F.Supp. 35, 36 (D.D.C.1997). Because the plain meaning of section 301 supports the district court's conclusion, I dissent from the majority's contrary holding.
 
 
 36
 The proposed visit with Hinckley's parents is plainly a "release from the hospital." The word "release" has various definitions, see XIII Oxford English Dictionary 558-59 (2d ed.1989), but one of its primary contemporary meanings, and one plainly applicable to confinement in a mental hospital, is "[t]o set or make free, to liberate, deliver of (now rare) or from pain, bondage obligation, etc," id. at 558 (definition 6.a) (italic original). It cannot be disputed that if Hinckley is allowed the proposed visit he will be freed, liberated and delivered--and therefore "released"--from the Hospital, albeit with the stipulations that he return to the Hospital the same day and that he be accompanied by Hospital staff during the visit. These stipulations do not render the proposed trip any less a "release"--they merely make the release "conditional" and therefore subject to section 301(e)'s conditional release regime set out above.
 
 
 37
 It is well established that a conditional release need not be permanent or indefinite. In Hough v. United States, 271 F.2d 458 (D.C.Cir.1959), the court specifically "read 'conditional release' as used in the present statute to include [a] kind of temporary freedom," notwithstanding that "the statute does not speak of temporary leaves from the hospital." 271 F.2d at 462. Further, the statute on its face provides that conditional release be, as here, "under supervision." The statute neither defines "supervision" nor distinguishes between supervision by Hospital staff and by someone else and I see no reason to import such a distinction. Because the statute "is silent as to the conditions of confinement or treatment" and "provides no specific test whereby one can determine whether rehabilitative therapy, which is clearly the province of the hospital alone, amounts to conditional release, which is the province of the court as well," "we must interpret the general language used in light of the legislative purpose." Id. The general policy underlying section 301 is "to provide treatment and cure for the individual in a manner which affords reasonable assurance for the public safety," id. at 461, and the specific purpose of subsection (e) is to "to assure that members of appellant's exceptionally dangerous class are 'kept under hospital restraint until the District Court, in the exercise of a discretion, reviewable in this Court, approves a relaxation of that restraint,' " United States v. Ecker, 543 F.2d 178, 186 (D.C.Cir.1976) (quoting Hough, 271 F.2d at 462). This purpose is well served by requiring court approval of attended as well as unattended trips by a member of the "exceptionally dangerous class," based on the required determination "that the individual has recovered sufficiently so that under the proposed conditions--or under conditions which the statute empowers the court to impose 'as (it) shall see fit,'--'such person will not in the reasonable future be dangerous to himself or others.' " Hough, 271 F.2d at 461 (quoting § 301).[2] The statute should therefore be interpreted to apply here to Hinckley's proposed attended visit with his parents.
 
 
 38
 Apart from the statutory language and purpose, this court's description of a section 301(e) "release" as a "relaxation" of "hospital restraint," Ecker, 543 F.2d at 186; Hough, 271 F.2d at 462, also manifests that the term encompasses attended trips outside the hospital grounds. The "restraint" being relaxed is that a person has been "committed to," that is, "confined in" "a hospital for the mentally ill." § 301(d)(1), (e). Any departure by a patient from the Hospital premises-and consequent public exposure-is a "relaxation,"--i.e., a "[p]artial (or complete) remission," XIII Oxford English Dictionary 554 (2d ed.1989) (definition 1.a)--of the restraint. Each such departure therefore requires court approval under section 301(e).
 
 
 39
 My reading of section 301(e)'s plain language to require approval of any departure from the Hospital grounds comports with the court's previous construction of the same provision in United States v. Ecker, 543 F.2d 178, 187 (D.C.Cir.1976). In Ecker, the court rejected the patient's contention that judicial review of the Hospital's conditional release decision should be under the same deferential standard "suggested" in Tribby v. Cameron, 379 F.2d 104 (D.C.Cir.1967), for reviewing the adequacy of a patient's in-hospital treatment.[3] The Ecker court expressly based its rejection of the Tribby standard on the distinction between decisions that affect whether a patient is to leave the hospital premises and those that do not:
 
 
 40
 The narrow standard of review described in Tribby only applies when public safety is not a factor; it has no applicability in release proceedings (conditional or unconditional) under section 301(e). To anticipate a bit what may be distilled from our decisions in this field, which we discuss below, the agency analogy is only pertinent within the hospital grounds. In that area we and the district court may give a degree of deference to the hospital's judgment equivalent to the deference we accord agency action; when, and if, the patient is to cross the hospital boundary, then other factors affecting the public come into play, and both the statute and our decisions impose a different role and far heavier responsibilities on the courts.
 
 
 41
 543 F.2d at 183 (footnote omitted; emphasis added).[4] The Ecker court then held that the Hospital's decision to seek conditional release-which permits a patient to "cross the hospital boundary"--is subject to de novo judicial review. See 543 F.2d at 183-88. Likewise here the Hospital sought to allow Hinckley to "cross the hospital boundary," thereby implicating public safety, and the same inquiry and standard apply.
 
 
 42
 My interpretation of the statute is also consistent with the court's discussion in Hough of what constitutes a "conditional release," as is manifest from the discussion above, see supra pp. 657-58, and with the Hough court's specific holding as well. In resolving one of the two appeals before it, the Hough court read the term " 'conditional release' as used in the present statute to include the kind of temporary freedom which has been given [Hough]," namely for her " 'to leave Saint Elizabeths Hospital to go to the city of Washington, D.C., unaccompanied in an effort to obtain employment.' " 271 F.2d at 459 (quoting the Hospital Superintendent's recommendation). There is nothing in the Hough decision that would exclude from the ambit of "conditional release" the kind of temporary (albeit less extensive) freedom the Hospital seeks for Hinckley.
 
 
 43
 For the preceding reasons I would affirm the district court's holding that the Hospital's proposal to release Hinckley from its confines is a "conditional release" subject to judicial review under the plain meaning of section 301(e)--without resort to inapplicable legislative history[5] or the irrelevant past practice of St. Elizabeths.[6] Of course, "calling it a conditional release does not prevent it. It simply requires the hospital authorities, when they decide that a patient has reached the stage where such freedom is necessary and proper, to certify that fact to the District Court and obtain an appropriate order, reviewable by this Court." Hough, 271 F.2d at 462. The district court then must "fulfill its statutory role by deciding whether or not the evidence supports the hospital's determination that in all reasonable likelihood the patient's temporary absence from the hospital under specified conditions will not endanger others." Id. The court below did just that and concluded: "With the record as it is, the Court cannot find by a preponderance of the evidence that Mr. Hinckley will not be a danger to himself or others should he be permitted to cross the boundary of St. Elizabeths Hospital under the proposal before the Court, even in the company of Hospital staff." 984 F.Supp. at 37. The court's finding was not clearly erroneous and should therefore be affirmed. See Ecker, 543 F.2d at 188 ("At our level the standard of review is well settled: The trial court's '(f)indings of fact shall not be set aside unless clearly erroneous.' ") (quoting Fed.R.Civ.P. 52(a)).
 
 
 44
 The district court based its finding here on the record that "was established in June of 1997," 984 F.Supp. at 37, when the court had issued an order and memorandum opinion denying Hinckley conditional release for monthly 12-hour unsupervised visits with his parents. United States v. Hinckley, 967 F.Supp. 557 (D.D.C.1997) (Hinckley I). The district court found in Hinckley I that Hinckley(1) was then diagnosed with "psychotic disorder not otherwise specified, in remission; major depression, in remission; and, narcissistic personality disorder," diagnoses on which each side's experts substantially agreed;
 
 
 45
 (2) "has a history of deception and a record of screening information he is otherwise obligated to provide to treating and examining clinicians," based both on Hinckley's stipulation to having deceived and manipulated those treating him from the time of his commitment in 1982 through the end of the decade[7] and on his more recent concealment from them of his stalking of Commander Jeanette Wick, the Hospital's Chief Pharmacist, and of his plan for a possible television interview;[8]
 
 
 46
 (3) "[a]s recently as March 1995-March 1996" "engaged in conduct with the Chief Pharmacist at the Hospital, Jeanette Wick, that has disturbing parallels to the conduct leading up to the shooting of President Reagan including the stalking of President Carter and Jodie Foster";[9]
 
 
 47
 (4) had "made progress," as psychological testing results showed, but "continues to be 'very defensive and represses a lot of his feelings.' "
 
 
 48
 967 F.Supp. at 561-62 (record citations omitted). Based on its factual findings and on the opinion of the government's expert witness, Dr. Raymond F. Patterson, the district court concluded that Hinckley's history of deception made the accuracy of favorable diagnoses suspect and raised the likelihood of an unpredictable "relapse," like the one in the "Wick Incident," posing a potential danger during the proposed off-premises visits with his parents. Id. at 562-63. Accordingly, the court concluded that Hinckley "failed to meet his burden that he will not be a danger to himself or others should he be permitted monthly twelve-hour unescorted visits with his parents off Hospital grounds" and that "[t]he severity of [his] criminal conduct, and his conduct at the Hospital since his admission in 1982, as well as his current behavior, all militate against the conditional release he seeks." Id. at 563. The evidence the district court cited not only supported but compelled its assessment of the danger Hinckley posed. Any other conclusion would have invited reversal for clear error.
 
 
 49
 Here the district court similarly concluded that the record as of June 1997, when Hinckley I issued, "showed that John Hinckley, Jr. is a dangerous individual with a history of deception" and that "Hinckley's criminal conduct and his conduct at the Hospital since his admission in 1982 militate against conditional release." 984 F.Supp. at 37. Most significantly, the court noted that "none of the parties here dispute that Mr. Hinckley's condition remains unchanged since June of 1997" ("[e]xcept for 'mild disappointment' at the news that his request for conditional release was denied"). Id. at 37 & n. 3 (emphasis added; record citation omitted). On appeal from Hinckley I, in which the appellant did not challenge the substance of the court's findings and conclusions,[10] we found the district court's review of the record without fault, see Hinckley v. United States, 140 F.3d 277 (D.C.Cir.1998), and I can only conclude, given Hinckley's history of deception, intimidation and violence and the uncertainty of his current mental state, that there was no clear error in the district court's conclusion here that it could not make the necessary "affirmative finding that it is at least more probable than not that he will not be violently dangerous in the future." Ecker, 543 F.2d at 188. The proposal here differs from Hinckley I in only two respects: the off-premises visit is limited to six (rather than twelve) hours and Hinckley must be attended by a Hospital staff technician and, en route, by a driver. The district court "considered the details of this plan carefully, but c[ould] not agree that even these safeguards are enough given the existing record in this case." 984 F.Supp. at 37. This fact-based conclusion is supported by the same evidence the court cited in Hinckley I.
 
 
 50
 Finally, I point out that even were the majority correct (which it is not) in holding that the proposed trip is not a section 301 "conditional release" requiring judicial approval, the proper disposition would be to remand to the district court for a determination under the Tribby standard (proposed below by Hinckley, 984 F.Supp. at 36) whether the Hospital, in concluding that Hinckley can leave the Hospital grounds without risk to the public, "has made a permissible and reasonable decision in view of the relevant information and within a broad range of discretion." 379 F.2d at 105.[11] Given Hinckley's long, undisputed history of mental illness, deception[12] and violence, I believe the district court can unquestionably conclude that the Hospital has not satisfied this standard.
 
 
 
 [1]
 The details of this plan were submitted to the court and appear in the sealed record
 
 
 [2]
 The Hospital was, however, obligated to notify the district court and the United States Attorney of Hinckley's outing under the terms of a stipulation entered into by the Hospital and the government in 1987, discussed below. See Joint Appendix ("J.A.") at 77
 
 
 [3]
 We hold that we do not have jurisdiction to review the propriety of Hinckley's proposed outing under the relevant District of Columbia statute, and thus we do not consider the potential use of the highly deferential standard of review applicable to the Hospital's treatment decisions announced in Tribby v. Cameron, 379 F.2d 104 (D.C.Cir.1967), and advocated by our dissenting colleague. Since we are not presented with the issue, we express no opinion on whether the United States might have standing as an aggrieved party under the Administrative Procedures Act (or any other provision of law in the same genus) to challenge the Hospital's therapeutic decisions regarding Hinckley
 Hinckley also argues that the district court judge should be removed from this case pursuant to 28 U.S.C. § 144 because her decisionmaking has been tainted by information regarding Hinckley's condition that is more than 10 years old. However, a district court exercising proper jurisdiction under section 301(e) may take into account a patient's past record, and in any event, nothing in the record on appeal demonstrates that this judge has been unable to rule fairly or has otherwise compromised the appearance of justice. See United States v. Wolff, 127 F.3d 84 (D.C.Cir.1997). Therefore, we deny Hinckley's request to transfer his case to another judge.
 
 
 [4]
 This evidence consisted of pictures of Jodie Foster, letters detailing his plans for a "cult" or "family," and correspondence praising Hitler and Charles Manson. See United States v. Hinckley, 725 F.Supp. 616, 622 & n. 13 (D.D.C.1989)
 
 
 [5]
 The Hospital classifies its forensic patients in four groups--A, B, C, and D. Hinckley is presently a "Class D" patient. Class D patients "may be granted various levels of unaccompanied status on the Hospital grounds only. In practice, such patients can be by themselves (but only on the grounds of the Hospital) for between 2-8 hours a day." Final Report of the National Institute of Mental Health (NIMH) Ad Hoc Forensic Advisory Panel, 12 MENTAL & PHYSICAL DISABILITY L. RPTR. 77, 87 (1988) (hereinafter "Final NIMH Report")
 
 
 [6]
 The district court relied primarily upon evidence and psychiatric testimony submitted in June 1997, when the court heard and denied a motion for conditional release brought by Hinckley under section 301(k), see D.C.Code § 24-301(k), which allows patients to bring habeas-type proceedings challenging the terms of their commitment. That hearing came about when, in 1996, Hinckley's treatment team recommended an unescorted 12-hour off-campus visit with his family once a month. The Hospital Review Board denied this recommendation, based in large part upon Hinckley's unwelcome attention in 1995-96 to a Hospital pharmacist who had reported that Hinckley seemed preoccupied with her to an unhealthy degree. See United States v. Hinckley, 967 F.Supp. 557 (D.D.C.1997) (Hinckley I). Hinckley filed a section 301(k) motion and argued that the decision of the treatment team should be reinstated. After the June 1997 hearing, the court denied the motion for a conditional release but did not address Hinckley's eligibility for an off-campus visit under Hospital supervision
 While the parties agree that the evidence of Hinckley's mental status presented in June 1997 would certainly be relevant were judicial review of the Hospital's decision available, we note, in light of the dissent's emphasis on this evidence, that it was presented in a very different context. Not only did the June 1997 hearing address only Hinckley's own request that he be allowed off-campus without supervision, but also at that hearing the Hospital Review Board opposed the plan for Hinckley's conditional release. In this case, the Hospital Review Board approved of and requested the issuance of a "B-City" pass as part of Hinckley's ongoing therapy.
 
 
 [7]
 The term "government" in this opinion refers to the United States Attorney. The District of Columbia has filed a brief as amicus curiae on behalf of St. Elizabeths, urging that a "B-City" pass is not a conditional release under section 301(e)
 
 
 [8]
 The government argues that Hinckley could ask for expedited review, but we have repeatedly held that we will not consider the possibility of expedited review in determining mootness. See Robinson, 935 F.2d at 287 n. 6
 
 
 [9]
 Although it is a fairly obvious point, we note that the parties here do not contest the meaning of "conditions" or "conditional"; the debate instead focuses on what it means to be "released."
 
 
 [10]
 Although none of the parties argue here that "conditionally released under supervision" in section 301(e) and "conditionally released from custody" used in other parts of the statute mean different things, we note that the House Report accompanying passage of the revised section 24-301 would in any case allay any such fear: the report explains that in section 301(e), an acquittee is "conditionally released under supervision" when he is released "to a legal guardian or other person subject to such conditions as the court may impose." See H. REP. NO. 84-892, at 17 (1955) (hereinafter "1955 House Report") (emphasis added). Thus, sections 301(e) and (k) do not contradict each other, but rather dovetail. A patient covered by the statute is conditionally released if he is released, with conditions, from the Hospital's custody to the supervision of another
 Moreover, section 301(k), added to section 24-301 in 1970 when Congress adopted the District of Columbia Court Reform and Criminal Procedure Act of 1970, Pub.L. No. 91-358, 84 Stat. 570, specifically cross-references the remainder of the statute (it refers who are "conditionally released from custody, pursuant to the provisions of this section"). And there is no legislative history otherwise discussing its choice of language, so there is nothing to counteract the presumption that its terms should be read the same way as the rest of the statute. See H.R.REP. NO. 91-907, at 73-74 (1970).
 The dissent, generally invoking the "plain meaning" rule of statutory construction, argues that nothing in the text of the statute indicates that "under supervision" in section 301(e) should be limited to the supervision of a party other than the Hospital. We question whether a statute's "silence," Dissent at 2, on whether an inherently vague term should be construed a certain way supports application of the plain meaning rule. We also note that the legislative history, cited above, casts serious doubt on the notion that "conditionally released under supervision" means "conditionally released under continuing Hospital supervision."
 
 
 [11]
 Our dissenting colleague labels this history "irrelevant" because, in her view, it pertains only to court supervision of unconditional releases and not conditional releases. That narrow a reading, however, ignores the broader design of the statute, and the legislative history, which define, in a series of contexts, the various junctures at which judicial supervision of the release of insanity acquittees is necessary in order to safeguard the public--regardless of whether the release is "conditional" or "unconditional." See 1955 HOUSE REPORT, at 13-14. Moreover, the section of the House Report which we cite to show that Congress was motivated by the public safety issues posed by an insanity acquittee's release into society does specifically address conditional releases as well. The Report says that the provision for court-supervised conditional release was intended to address the same public safety concerns posed by unconditional reentry into society, while allowing "psychiatric aftercare supervision" for those who might not otherwise be eligible for unconditional release. See id. (court-supervised conditional release would "[g]ive to the public an increased feeling of security")
 
 
 [12]
 The government does not dispute that section 4243(h) applies only to Federal insanity acquittees committed after 1984, when the Insanity Defense Reform Act, 18 U.S.C. §§ 4241 et seq., was enacted. See United States v. Crutchfield, 893 F.2d 376 (D.C.Cir.1990)
 
 
 [1]
 An unconditional "release" is authorized when the Hospital superintendent certifies and the court subsequently finds that a patient "has recovered his sanity" and "will not in the reasonable future be dangerous to himself or others." § 301(e)
 
 
 [2]
 It makes no difference that an attended release may be therapeutic or a necessary precursor to broader liberty, as the majority seems to suggest, Majority Op. at 656. This is clear from Hough. See 271 F.2d at 462 ("We readily grant that periodic freedom may be valuable therapy.... We do not, of course, lose sight of the hospital's view that such temporary freedom is often an essential part of the therapeutic process....")
 
 
 [3]
 The Tribby court stated:
 We do not suggest that the court should or can decide what particular treatment this patient requires. The court's function here resembles ours when we review agency action. We do not decide whether the agency has made the best decision, but only make sure that it has made a permissible and reasonable decision in view of the relevant information and within a broad range of discretion.
 379 F.2d at 105.
 
 
 [4]
 The Ecker court noted that in Covington v. Harris, 419 F.2d 617 (D.C.Cir.1969) (en banc), "this court faced another situation where a district court was asked to review a medical judgment affecting only the internal administration of Saint Elizabeths Hospital" when a patient "through a writ of habeas corpus sought transfer to a less restrictive ward of the hospital." 543 F.2d at 183 n. 11. The Ecker court explained that "[s]ince public safety is not a significant consideration where a patient seeks transfer to another ward within the hospital, the [Covington] court applied the standard of limited review announced in Tribby." Id. (citing Covington, 419 F.2d at 621) (emphasis added)
 
 
 [5]
 The snippet of history the majority quotes for the proposition that the Congress intended public safety to be safeguarded only upon an inmate's "reentry into society" is addressed not to conditional release but to unconditional release which requires a finding that the patient "has recovered his sanity," § 2434-301(e). Compare Majority Op. at 655 (quoting 1995 House Report, at 13: "It is the opinion of the Committee [ ] that once a person has been excused from his criminal act or acts by reason of insanity he not thereafter be released into society until it is reasonably certain that the person has recovered his sanity and is no longer dangerous to himself or others.") (emphasis added) with Ecker, 543 F.2d at 184 n. 14 ("The legislative distinction between conditional and unconditional releases ... is that only unconditional releases require a showing that the patient has recovered his sanity."). Nevertheless, the visit proposed for Hinckley does involve a reentry into society, however brief or encumbered
 
 
 [6]
 I do not see any relevance in St. Elizabeths's past practice, which the majority discusses at some length. See Majority Op. at 655-56. We cannot possibly owe deference to the Hospital in determining the reach of " 'the statute's grant of judicial power to protect the public safety.' " Ecker, 543 F.2d at 184 (quoting Hough 271 F.2d at 461). That the Hospital has long and often permitted attended off-premises trips through " 'B-City' passes" shows only that the Hospital did not think to notify the court and the United States Attorney, pursuant to section 301(e), of impending releases. I find it telling in any event that the Hospital made no attempt to defend its longstanding practice or to protect its interests in any way in this appeal until we sua sponte requested it to submit an amicus curiae brief. See United States v. Hinckley, No. 97-3183 (filed Oct. 27, 1998) (ordering "that the District of Columbia, as operator of St. Elizabeths Hospital, is directed to file an amicus curiae brief" to include "an explanation of the frequency and type of off-ground visits that the hospital has been allowing without resort to the procedure set forth in § 301"). In fact, it does not appear that the Hospital ever expressed any dissatisfaction with, much less objection to, the 1987 agreement between Hinckley and the United States Attorney requiring notice and court approval of any departure by Hinckley from the Hospital grounds. If requiring judicial approval of attended off-premises patient trips will in fact impose the "significant burden" the Hospital predicts, see Amicus Curiae Brief at 3, the Hospital would have moved much sooner to protect its interests
 
 
 [7]
 The court found particularly "disturbing" the following journal entry Hinckley made in 1987 when he had already been in treatment at St. Elizabeths for five years and had, as now, "convinced his treatment clinicians that he had recovered sufficiently for conditional release":
 I dare say that not one psychiatrist who has analyzed me knows any more about me than the average person on the street who has read about me in the newspapers. Psychiatry is a guessing game and I do my best to keep the fools guessing about me. They will never know the true John Hinckley. Only I fully understand myself.
 
 
 [967]
 F.Supp. at 562 (record citation omitted)
 
 
 [8]
 According to the court Wick testified that sometime in 1995 Hinckley "asked her advice on whether she thought he should be interviewed by Barbara Walters." 967 F.Supp. at 559 (record citation omitted)
 
 
 [9]
 The court found specifically:
 These parallels include continued pursuit of a personal relationship with Cmdr. Wick even after it became clear that she was not interested, making unannounced visits to her office when told not to do so by her, making numerous telephone calls and, on some occasions, identifying himself only when Cmdr. Wick answered the phone, gathering information about her after-hours personal schedule, recording love songs for her and using the pet name of her daughter in one of the songs, and staring at her in a menacing fashion more than eight months after he was told to avoid her by Hospital Staff.
 
 
 [967]
 F.Supp. at 562
 
 
 [10]
 His failure to challenge the court's determinations in the previous appeal may preclude his doing so now. See Laffey v. Northwest Airlines, Inc., 740 F.2d 1071, 1076 (D.C.Cir.1984) (refusing to revisit issues decided in earlier appeals, "hold[ing] that 'the strong policy of repose,' precludes consideration of ... earlier rehearsed arguments and more recent afterthoughts") (quoting Laffey v. Northwest Airlines, Inc., 642 F.2d 578, 585 (D.C.Cir.1980))
 
 
 [11]
 I remain at a loss to understand how we can leave the public safety decision to the Hospital, which the Tribby standard does, when the Congress so unequivocally assigned it to the court
 
 
 [12]
 If Hinckley could successfully (and significantly) deceive his treatment team, as was established in Hinckley I, those individuals' formulation of any decision based on Hinckley's behavior or reactions must be viewed with caution