# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 13-50870

UNITED STATES OF AMERICA,

United States Court of Appeals
Fifth Circuit

**FILED**

August 22, 2014

Plaintiff-Appellee

Lyle W. Cayce
Clerk

v.

MARVIN GOODLOW WASHINGTON,

Defendant-Appellant

Appeal from the United States District Court
for the Western District of Texas

Before STEWART, Chief Judge, and WIENER and COSTA, Circuit Judges.

WIENER, Circuit Judge:

Defendant-Appellant Marvin Goodlow Washington refused to abide by the rules of his group home and received an eviction notice. The government sought his arrest because continued residence in that group home was a condition of Washington's continued release under 18 U.S.C. § 4243 ("Section 4243"), which creates a system of conditional release for individuals who, like Washington, were found not guilty of crimes only by reason of insanity. The district court heard testimony from Washington's probation officer and revoked Washington's conditional release after finding that (1) Washington's eviction constituted a violation of his treatment regimen, and (2) his continued release posed a substantial risk to society. Because the doctors who crafted Washington's release plan included residence in a group home as an express

No. 13-50870

element, and because the district court's substantial-risk finding was not clearly erroneous, we affirm that court's judgment.

## I. FACTS AND PROCEEDINGS

In January 2008, Washington entered a Bank of America branch in Waco, Texas, walked behind the teller counter, and began to stuff cash into a garbage bag. When a teller approached, Washington said "Don't make me stab you." He then left the bank with $2,711 in cash. When officers responded, they observed Washington standing near an intersection approximately one block away, holding the garbage bag. He had transferred $11 to his pocket; the rest of the money was still in the bag. Officers did not report finding a weapon.

Doctors who later examined Washington reported that the reason he did not flee from the bank was that he suffered from paranoid delusions at the time of the robbery (including his false belief that he was married to, and had fathered a child with, a female officer of the Texas Department of Corrections); neither did he appreciate the wrongfulness of his conduct. In a post-arrest interview with an FBI agent, Washington indicated that he robbed the bank to attract media attention to the fact that his wife was missing—in reality, Washington was unmarried—and that he intended to return the money but was arrested before he could do so.

The government charged Washington with bank robbery by force and violence. On defense counsel's motion, the court ordered a competency evaluation, after which Washington's doctors concluded that he was incompetent to stand trial. Staff at the Federal Medical Center in Butner, North Carolina ("FMC-Butner"), charged with continuing to evaluate Washington over several months, eventually sought and obtained the court's permission to administer psychotropic medication, involuntarily if need be, in an effort to restore Washington's mental health and achieve competency.

2

No. 13-50870

Approximately six months later, in June 2009, the FMC-Butner staff concluded that Washington was competent.

At a bench trial in October 2009, the district court found Washington not guilty by reason of insanity and committed him to a mental health facility for evaluation and treatment. In 2012, the Bureau of Prisons certified that Washington had recovered from his mental disease or defect to the extent that his conditional release should be considered. The district court held a hearing and, in April 2012, conditionally released Washington based on its finding, by clear and convincing evidence, that his release under a regimen of care and treatment would not pose a substantial risk of bodily injury to another person or serious damage to the property of another. The court set several conditions, including requirements that Washington (1) remain under the supervision of the probation office, (2) participate in a regimen of mental health care, (3) continue to take prescribed medications, and, most importantly for purposes of this appeal, (4) reside at Guidance House, a group home in Burlington, North Carolina—he was not to change his residence without the court's permission.

About fifteen months later, in early July 2013, the probation office filed a petition for a warrant for Washington's arrest. The warrant petition's sole allegation was that Washington "violated Condition Number 5; that requires he will reside at the Guidance House. . . . Mr. Washington may not change residences without permission of the Court; in that, he has been served an eviction notice effective July 10, 2013." The district court issued the warrant and Washington was arrested that day.

The district court held a hearing the next month to address the revocation of Washington's conditional release. At the hearing, Washington's probation officer, Karen Tremblay, was the only witness; Washington did not testify or present any witnesses. The court, hearing no objection, received into evidence two letters dated June 11, 2013 and written by Jean Majors, the

No. 13-50870

Program Director of Guidance House, one addressed to Washington and the other addressed to Tremblay.

The letter to Washington indicates that he met with Majors to discuss "problems that are being experienced in this facility and [Washington's] concerns about being in the wrong facility." The "problems" included "[Washington's] verbal combativeness" with staff and other residents and curfew violations including failure to sign out during the day and sneaking in and out of windows at night. The letter includes Majors's observation that Guidance House is a more restrictive environment than Washington had been led to believe when he was given options for placement on his conditional release, and that his resulting anger and frustration "spills over to create a hostile environment for everyone—yourself, the Director, other clients, staff[,] and others involved." According to the letter, Washington clearly indicated at the meeting that he wanted to leave Guidance House and would accept any resulting consequences—in fact, he refused to sign a commitment to follow the Guidance House rules, knowing that his refusal would result in his receipt of a 30-day eviction notice. Majors's letter to Washington also indicates that Guidance House supported Washington's exploration of less-restrictive housing options.

The second letter, addressed to Tremblay, includes Majors' observations that Washington "seems to feel that the rules of the group home apply to everyone but him" and that he

> is becoming more aggressive towards the other clients . . . , telling them that they "better not say anything to anyone about what he does or doesn't do." This was said because he felt that the clients were "telling on him" when he knocked on their window to get access into the group home after leaving during a time when he should have been in bed asleep.

4

No. 13-50870

At the hearing, Tremblay testified that Washington "was in compliance with his medications" throughout his time at Guidance House. She testified to some contact between the probation office and Washington's FMC-Butner doctor, but stated her belief that the doctor had not been consulted about the attempt to re-commit Washington. The hearing transcript does not indicate any attempt by counsel for either party to introduce a report from any medical professional, nor did the district court discuss this omission or the possibility of ordering an examination or report from a medical professional.

Turning to non-medical evidence, the record on appeal includes Tremblay's testimony that Washington had sought and obtained employment during his time at Guidance House, including an initial cash job at a car wash and then a job at McDonald's that continued for several months, up to the time of his eviction and arrest. Tremblay also indicated that, having completed his GED while at FMC-Butner, Washington enrolled in community college while living at Guidance House. Tremblay confirmed that to her knowledge Washington had not been involved in any physical assaults or subject to any criminal charges while on conditional release.

Tremblay stated that her office had "exhausted its efforts to work with Mr. Washington and hav[e] him come back into compliance," but also stated that she could recommend to the court that Washington be placed in a transitional home rather than be re-committed if an appropriate facility could be found.[1] Tremblay also testified that she believed that Washington "tried to physically intimidate" her by following her to her vehicle and "getting in [her] personal space" after she refused to allow him unsupervised time with his

---

[1] In another response, Tremblay explained that her "opinion is that at this time Mr. Washington cannot be safely maintained in the community because he's not in an agreement with following the conditions of the Court or any particular facility that has rules and regulations."

girlfriend. When asked whether, based on her experience, she believed Washington was mentally stable, Tremblay responded "I do not." Tremblay stated that she based her belief that Washington should be reevaluated by medical professionals "on a number of things, his escalating behaviors, his limited insight into his mental illness, his compulsive behaviors, his inability to think that the rules apply to him. He has an extreme sense of entitlement and what I would call grandiose."

The court heard arguments from counsel. When pressed by the court to cite evidence that Washington was dangerous, counsel for the government pointed to: (1) Majors's observation, found in her letter to Tremblay, that Washington was "becoming more aggressive," and (2) "the fact that he was aggressive to his U.S. probation officer," a reference to Tremblay's testimony that Washington "[got] in [her] personal space." Counsel for the government continued: "We don't have any evidence, Judge, that he went out and was beating up people on the street. We presented to you what I believe is circumstantial evidence and direct evidence that shows that he is becoming increasingly aggressive and wanting to do his own thing and not be held accountable." The hearing concluded with the following colloquy and oral ruling:

> Government counsel: . . . I'm also concerned [that] when someone with Mr. Washington's background starts going—escalating like this and then they get into money trouble and then they owe all this money . . . to people. I'm concerned that there's a possibility he could go out and commit other crimes to try and get the money that he's—that he needs and live the way he wants to live. I think taken all that—it's not one little thing, Judge.
>
> The court: I wish you wouldn't use the word "possibility."
>
> Government counsel: Well, I think it's probable. I think it's going to happen. I mean, people can disagree and I'm sure everybody'll disagree, but I think when you start looking at his behavior and

No. 13-50870

what he's doing and the fact that he doesn't care about the rules and he's doing whatever he wants to do with people, with money, that he is going to commit another crime. Whether it's a bank robbery, I don't know. Whether it's holding up somebody, I don't know, and that's my concern. It's a totality of everything that we've presented. And, Judge, I'm not sure whether or not we even had the burden in this case or not but I took the burden because, you know, it's what we should do.

The court: I'm not sure it really matters so much who has the burden. The facts are what the facts are.

Government counsel: The facts are what they are, Judge. That's all I have.

The court: All right. The Court would find that Mr. Washington has violated the conditions of his conditional discharge and could be a danger, would be a danger to at least the property of others and his conditional release will be revoked. And I suppose Mr. Washington has the right to appeal this matter. [. . .]

The court later supplemented its oral ruling with brief written reasons.

The district court's written order stated, in relevant part, as follows:

Having considered the evidence presented at the hearing . . . the Court is persuaded that the Government has proven by clear and convincing evidence that the Defendant has violated his conditional release by failing to comply with the prescribed regimen of medical, psychiatric, or psychological care or treatment in that the Defendant was evicted from the Guidance House in Burlington, North Carolina and failed to inform the U.S. Probation Office of his eviction. The Government further established by clear and convincing evidence that Defendant had increasingly hostile confrontations with staff.

The Court, therefore, finds that Defendant has failed to comply with the prescribed regimen of medical, psychiatric, or psychological care or treatment, and that his continued release will create a substantial risk of bodily injury to another person or serious damage to property of another.

Washington timely filed a notice of appeal.

No. 13-50870

## II. STANDARD OF REVIEW

We review questions of statutory interpretation de novo.[2] Factual findings, such as the district court's finding of dangerousness under Section 4243, are reviewed for clear error.[3] "Clear-error review only requires a factual finding to be plausible in light of the record as a whole."[4]

## III. ANALYSIS

Section 4243 establishes civil commitment procedures for individuals found not guilty only by reason of insanity. Such individuals may obtain conditional release on demonstrating, by clear and convincing evidence, that their release will not pose a substantial risk to the public. Conditional release, once achieved, "is not necessarily permanent;" Subsection (g) allows for the revocation of a conditional release when a district court makes each of two findings: (1) The individual failed to comply with his treatment regimen, and (2) his continued release would create a substantial risk to society.[5] Washington challenges both findings.

---

[2] *United States v. Mitchell*, 709 F.3d 436, 442 (5th Cir. 2013).

[3] *Id.* at 443.

[4] *Id.* (internal quotation marks and citation omitted).

[5] *Mitchell*, 709 F.3d at 438 (citing *Shannon v. United States*, 512 U.S. 573, 577 (1994)). Section 4243 provides, in relevant part, as follows:

§ 4243. Hospitalization of a person found not guilty only by reason of insanity

(a) **Determination of present mental condition of acquitted person.**—If a person is found not guilty only by reason of insanity at the time of the offense charged, he shall be committed to a suitable facility until such time as he is eligible for release pursuant to subsection (e) [sic, should read "subsection (f)"].

(b) **Psychiatric or psychological examination and report.**—prior to the date of the hearing, pursuant to subsection (c), the court shall order that a psychiatric or psychological examination of the defendant be conducted, and that a psychiatric or psychological report be filed with the court. . . .

No. 13-50870

(c) **Hearing.**—a hearing shall be conducted pursuant to the provisions of section 4247(d) and shall take place not later than forty days following the special verdict.

(d) **Burden of proof.**—In a hearing pursuant to subsection (c) of this section, a person found not guilty only by reason of insanity of an offense involving bodily injury to, or serious damage to the property of, another person, or involving a substantial risk of such injury or damage, has the burden of proving by clear and convincing evidence that his release would not create a substantial risk of bodily injury to another person or serious damage of property of another due to a present mental disease or defect. With respect to any other offense, the person has the burden of such proof by a preponderance of the evidence.

(e) **Determination and disposition.**—If, after the hearing, the court fails to find by the standard specified in subsection (d) of this section that the person's release would not create a substantial risk of bodily injury to another person or serious damage of property of another due to a present mental disease or defect, the court shall commit the person to the custody of the Attorney General. [. . .]

(f) **Discharge.**—When the director of the facility in which an acquitted person is hospitalized pursuant to subsection (e) determines that the person has recovered from his mental disease or defect to such an extent that his release, or his conditional release under a prescribed regimen of medical, psychiatric, or psychological care or treatment, would no longer create a substantial risk of bodily injury to another person or serious damage to property of another, he shall promptly file a certificate to that effect with the clerk of the court that ordered the commitment. The clerk shall send a copy of the certificate to the person's counsel and to the attorney for the Government. The court shall order the discharge of the acquitted person or, on the motion of the attorney for the Government or on its own motion, shall hold a hearing, conducted pursuant to the provisions of section 4247(d), to determine whether he should be released. If, after the hearing, the court finds by the standard specified in subsection (d) that the person has recovered from his mental disease or defect to such an extent that—

(1) his release would no longer create a substantial risk of bodily injury to another person or serious damage to property of another, the court shall order that he be immediately discharged; or

(2) his conditional release under a prescribed regimen of medical, psychiatric, or psychological care or treatment would no longer create a substantial risk of bodily injury to another person or serious damage to property of another, the court shall—

(A) order that he be conditionally discharged under a prescribed regimen of medical, psychiatric, or psychological care or treatment that has been prepared for him, that has been certified to the court as appropriate by the director of the facility

9

No. 13-50870

## A. The district court's finding that Washington violated his treatment regimen

By insisting that the district court overstepped its authority in adding an ancillary requirement of residence at Guidance House, Washington implicitly assumes that the residence condition was in fact ancillary, and thus not part of his prescribed regimen. The government responds that the district court made the finding in question, namely that the eviction constituted a violation of the treatment regimen. The government's response appears to misapprehend the thrust of Washington's argument: He insists that the district court erred in finding that his eviction constituted a violation of his prescribed regimen, not, as the government implies, that the district court

---

in which he is committed, and that has been found by the court to be appropriate; and

(B) Order, as an explicit condition of release, that he comply with the prescribed regimen of medical, psychiatric, or psychological care or treatment.

The court at any time may, after a hearing employing the same criteria, modify or eliminate the regimen of medical, psychiatric, or psychological care or treatment.

**(g) Revocation of conditional discharge.**—The director of a medical facility responsible for administering a regimen imposed on an acquitted person conditionally discharged under subsection (f) shall notify the Attorney General and the court having jurisdiction over the person of any failure of the person to comply with the regimen. Upon such notice, or upon other probable cause to believe that the person has failed to comply with the prescribed regimen of medical, psychiatric, or psychological care or treatment, the person may be arrested, and, upon arrest, shall be taken without unnecessary delay before the court having jurisdiction over him. The court shall, after a hearing, determine whether the person should be remanded to a suitable facility on the ground that, in light of his failure to comply with the prescribed regimen of medical, psychiatric, or psychological care or treatment, his continued release would create a substantial risk of bodily injury to another person or serious damage to property of another.

18 U.S.C. § 4243.

10

erred by failing to make a finding one way or the other. Although the parties thus focus on whether the district court had the authority to set conditions beyond the prescribed treatment regimen, we need not address that issue because Washington's residence condition was an express component of his physician-prescribed treatment regimen.

Washington relies primarily on a 2010 decision from the Eleventh Circuit, *United States v. Crape*.[6] In that case, the court vacated the district court's judgment recommitting Michael Crape, who had been found not guilty only by reason of insanity after mailing threatening letters to President George W. Bush and Vice-President Cheney.[7] Crape's mental condition improved during his subsequent commitment to the extent that the court ordered his "release on the condition that he continue to obey his doctors and take his medication. But *the court* also imposed another condition: 'Mr. Crape shall not mail, distribute, or otherwise transmit any threatening communications. Revocation of conditional release is mandatory for mailing, distributing, or otherwise transmitting any threatening communications.'"[8] Crape's mental health deteriorated for unknown reasons during his release, and he was arrested after sending another threatening letter.[9] At his revocation hearing, Crape's counsel argued that the court could not re-commit Crape without finding that he had failed to comply with his treatment regimen.[10] "The court, after admitting uncertainty as to 'whether [Crape had] failed to comply with what [his doctors] told him to do,' rejected that argument."[11] The district court

---

[6] 603 F.3d 1237, 1243-44 (11th Cir. 2010).

[7] 603 F.3d at 1239-40.

[8] *Id.* at 1240 (emphasis added).

[9] *Id.*

[10] *Id.*

[11] *Id.*

ordered Crape's re-commitment after making a substantial-risk finding but without making any finding as to Crape's failure to comply with his prescribed regimen.[12] The Eleventh Circuit reversed after holding that Section 4243 does not empower district courts to add conditions beyond the prescribed regimen.[13]

Washington's reliance on *Crape* is misplaced because, unlike the ancillary requirement imposed by the court in *Crape*, the residence requirement here was a component of Washington's physician-prescribed regimen. Washington's FMC-Butner doctors certified their release plan to the court pursuant to subsection (f)(2) of Section 4243.[14] That plan does not appear to include all of the conditions ultimately ordered by the district court—many of which were suggested by the probation office as if in the context of supervised release[15]—but the plan does include the following specific reference to the group home placement, under the heading "Social Support/Community Resources":

> Social support may play a role in decreasing the risk of future violence, while negative social influences and environmental stresses could increase the potential for problems. Mr. Washington has no social support, but has shown he is adept at making friends. He has duly impressed both his future probation officer, and the group home owner, who has chosen to hold his place [in] her home. *Our plan consists of placing him [in] a group home,* outpatient mental health services, and social

---

[12] *Id.*

[13] *See id.* At 1240-47.

[14] 18 U.S.C. § 4243(f) (2) (". . . the court shall . . . order that he be conditionally discharged under a prescribed regimen of medical, psychiatric, or psychological care or *treatment that has been prepared for him, that has been certified to the court as appropriate by the director of the facility in which he is committed*, and that has been found by the court to be appropriate. . . ." (emphasis added)).

[15] Washington does not argue on appeal that the district court overstepped its authority by ordering conditions beyond those "certified to the court as appropriate by the director" of FMC-Butner pursuant to subsection (f)(2).

security disability *in order to maximize his success in the community*.

The ancillary condition in *Crape* originated with the district court; by contrast, Washington's required residence in the group home was a stated element of his doctors' plan for maximizing his success. Accordingly, we hold that the residence condition was a component of the prescribed regimen, and affirm as not clearly erroneous the district court's finding that Washington violated his regimen.

## B. The district court's finding that Washington's continued release posed a substantial risk to the public

Assessing the dangerousness of a person who has previously been found not guilty only by reason of insanity, but who has subsequently received treatment, is a necessarily fact-intensive inquiry. Courts typically consider any indications of a propensity for violence or destructiveness, paying careful attention to recent violent episodes, threats, or actions. Courts also examine the individual's mental health—particularly the extent of any compliance or non-compliance with a treatment regimen.

In *Mitchell*, we affirmed as not clearly erroneous the district court's finding that Mitchell's continued release posed a substantial risk.[16] The evidence demonstrated that Mitchell was not taking all of his medications, and that he resisted doing so at least in part because of unwanted side effects.[17] Mitchell also told his therapist that he no longer wished to participate in his treatment.[18] Mitchell's probation officer reported increased agitation and aggressiveness, and Mitchell's therapist concluded that he was a danger to the

---

[16] 709 F.3d at 444.

[17] *Id.* at 443.

[18] *Id.*

No. 13-50870

community, especially to women, in light of his history of violence during unmedicated periods.[19]

Our only other opinion addressing re-commitment under Section 4243 is *United States v. Boggs*, a 1995 unpublished per curiam.[20] Noting that it was "a close case," we affirmed the district court's decision to revoke Boggs's conditional release.[21] Boggs had also gone off his medication.[22] Two of his mental health care providers testified that he "posed only a small if unpredictable risk of injury to others in the near future," but, because he failed to take his medication, "he posed a substantial risk of harm in the long term."[23] They expressed concern that his paranoia would cause him to violently "defend himself" even in the absence of actual provocation.[24] There was no evidence that he had ever harmed anyone in the past.[25]

---

[19] *Id.*

[20] *United States v. Boggs*, 1995 WL 581569, *1 (5th Cir. Aug. 25, 1995).

[21] *Id.*

[22] *Id.*

[23] *Id.*

[24] *Id.*

[25] *Id.* A review of decisions from other circuits reveals that, like the individuals in *Mitchell* and *Boggs*, individuals who are re-committed typically have stopped taking prescribed medication. *See, e.g.*, *United States v. Sellers*, 549 F. App'x 139, 140-41 (4th Cir. Dec. 10, 2013) (unpublished) (per curiam) (affirming re-commitment of individual with history of violence and alcoholism who experienced precipitous decline in mental state, refused additional medication, began drinking again, ceased contacting probation officer, and experienced delusions of persecution that made him aggressive), *United States v. Ambers*, 360 F. App'x 39, 40-41 (11th Cir. Jan. 6, 2010) (unpublished) (per curiam) (affirming re-commitment when individual went off his medication and began self-medicating with psychoactive substances, which increased his paranoia, which caused him to purchase a weapon to protect himself); *but cf. United States v. Logsdon*, 450 F. App'x 704, 705-07 (10th Cir. Nov. 1, 2011) (unpublished) (affirming re-commitment, but making no mention of any prescribed medication, when—on the first day of release conditioned on residing at a particular facility, abstaining from alcohol, and refraining from committing any crime—the individual allegedly bought alcohol for a minor and consumed some himself, resulting in his arrest and eviction from the facility).

14

The parties' positions on appeal reflect the fact-intensive nature of this inquiry. Washington insists that there was "no evidence" that he posed a risk of bodily injury to anyone or of property damage. Washington points to the many parts of Tremblay's testimony indicating that he was employed, pursuing his education, and simply chafing under the yoke of a restrictive environment that was no longer appropriate in light of his improved mental health. For its part, the government points to Tremblay's testimony about Washington's increased verbal aggression in his interactions with her, and to Majors's similar observation about his interactions with the staff and residents at Guidance House.

The record reflects that Washington was not getting along well with the people around him, and the district court inferred that his increasing verbal aggressiveness was a sign of dangerousness, or even potential illness, rather than a sign of recovery and attendant resurgence of his desire for autonomy. We cannot say that the district court's ultimate substantial-risk finding is implausible in light of the record as a whole. It therefore is free of clear error.

We are aware that our affirmance of the district court's finding would appear to lower the bar for re-commitment proceedings insofar as our earlier precedents generally have addressed individuals who refused to follow their doctors' advice. We also note that this close question was made even more difficult by the parties' choices not to present any evidence of professional medical opinion as to any risk posed by Washington's release. And we are keenly aware that, under Section 4243, District judges have an awesome responsibility to protect the public and to strike the difficult balance with individual liberty. We therefore emphasize that every substantial-risk assessment must turn on the unique factual circumstances of each case rather than on an attempt to compare one individual to another.

No. 13-50870

## IV. CONCLUSION

The district court's judgment revoking Washington's conditional release under Section 4243 is AFFIRMED.