RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 23a0124p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

UNITED STATES OF AMERICA,

    *Plaintiff-Appellee*,

    *v.*

RICHARD AUSTIN WILLIAMS,

    *Defendant-Appellant*.

No. 22-5002

─────────────

Appeal from the United States District Court for the Eastern District of Tennessee at Knoxville.
No. 3:98-cr-00005-1—Thomas A. Varlan, District Judge.

Argued: June 7, 2023

Decided and Filed: June 12, 2023

Before: SUTTON, Chief Judge; LARSEN and MURPHY, Circuit Judges.

─────────────

## COUNSEL

─────────────

**ARGUED:** Kevin M. Schad, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Cincinnati, Ohio, for Appellant. Luke A. McLaurin, UNITED STATES ATTORNEY'S OFFICE, Knoxville, Tennessee, for Appellee. **ON BRIEF:** Kevin M. Schad, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Cincinnati, Ohio, for Appellant. Luke A. McLaurin, UNITED STATES ATTORNEY'S OFFICE, Knoxville, Tennessee, for Appellee.

─────────────

## OPINION

─────────────

SUTTON, Chief Judge. Richard Williams violated the conditions of release that a district court imposed after it found him not guilty of an alleged crime by reason of insanity. Placing the burden on Williams, the court found that Williams posed "a substantial risk" of harm

to the public and committed him to the custody of the Attorney General.  18 U.S.C. § 4243(g).  We affirm.

I.

Williams suffers from mental illness, a bipolar form of schizoaffective disorder.  In his case, the disorder has led to delusions and auditory hallucinations as well as to "aggressive, impulsive, and threatening behavior."  R.132 at 36.

One feature of Williams's illness has been a fixation on a toothbrush that he designed in the 1980s.  Williams provided sample toothbrushes to Boucherie, a brush manufacturing company.  The company decided not to acquire his brush, but Williams believes that Boucherie stole his design and denied him credit for it.

Williams called Boucherie in 1997.  Believing that it had mistreated him, Williams threatened to mail a bomb to the company if it did not compensate him for his work.  Instead of a check, Williams received a visit from law enforcement and a felony charge for sending a threatening message in interstate commerce.  *See* 18 U.S.C. § 875(c).

After a bench trial, the district court found Williams not guilty by reason of insanity.  *See id.* §§ 17, 4242(b)(3).  The court committed Williams to civil institutional care until his mental health improved.  *See id.* § 4243(a).

The court released Williams nearly two years later.  Intervening treatment, the court reasoned, had improved Williams's condition to the point that he did not present a danger to the public.  *See id.* § 4243(f)(2).

His freedom came with conditions.  Among several others, Williams could not communicate with Boucherie and had to take his prescribed medications.  Violating his conditions of release, the court warned, would result in arrest and a new assessment of whether he remained eligible for release.

These conditions proved difficult for Williams.  At one time or another, he has violated nearly all of them.  Perhaps the most numerous (and worrying) violations stem from Williams's refusal to take medication.  Sometimes he has refused openly, and other times surreptitiously,

"deceiving the treatment providers."  R.75 at 2.  Without medication, Williams returns to unpredictable behavior and threats of violence as his "delusions become very intense, grandiose and paranoid."  R.76 at 3.

Williams's fixation on Boucherie endured.  Despite the prohibition on contacting the company, Williams emailed Boucherie in 2005.  Three years later, he called the company.  Four years after that, Williams again emailed Boucherie.

Williams defied the prohibition yet again in the spring of 2021.  Around 6:00 on a Saturday morning, he placed numerous calls to Boucherie's offices.  "Hey, you know who I am," Williams told one employee on a call lasting several minutes.  R.143 at 16.

After this last call, the court directed a team of mental health experts to evaluate Williams.  The resulting report confirmed that Williams suffers from psychosis and manic behavior.  And it concluded that releasing Williams would endanger others, predicting that he would "likely" violate the conditions again.  R.132 at 35.

The report also shed further light on Williams's history, including arrests for assault and aggravated assault.  He threatened then-Vice President Al Gore.  He attempted to strike someone with a car.  He started a fire at a duplex.  He threatened his sister and "attacked" her at their parents' home.  *Id.* at 32–33.  And he wrote about killing his mother.  The report also found that Williams "lack[ed] insight into his mental disorder, violence risk, and need for treatment."  *Id.* at 34.

The court held a hearing to decide whether it should revoke Williams's release.  The government pointed to the mental-health report and a probation officer's testimony, all favoring revocation.  Williams disagreed, expressing optimism that he could move past "this brush thing."  R.143 at 28–29.  The court found that releasing Williams would pose a significant risk to the community, revoked his release, and committed him for treatment.  In doing so, the court placed the burden of proof on Williams.  On appeal, Williams contends that the court misallocated the burden of proof and misapprehended the evidence.

II.

*Burden of proof.*  Does § 4243(g) place the burden of proof on Williams to show that his continued release would not "create a substantial risk" to the public?  18 U.S.C. § 4243(g).  Yes, as history, the language of § 4243, and the structure of the statute show.

A.

Start with the backdrop to § 4243.  For most of American history, federal criminal law gave juries two options in a criminal case:  guilty or not guilty.  This did not preclude a successful insanity defense.  It just meant that the defendant's mental health became a potential reason for finding an absence of guilt, say because the defendant, temporarily or more permanently, did not have the capacity to form the requisite mental state to violate the law.  In this context, defendants who prevailed in mounting an insanity defense received the same benefit as anyone else found not guilty in a criminal case:  release into society.  *Shannon v. United States*, 512 U.S. 573, 575–76 (1994).  Throughout that time, federal law thus had these relevant features.  It did not require the defendant to prove insanity; the government still had to prove he had the requisite state of mind—that the defendant was sufficiently sane to commit the offense.  *Id.* at 575; *United States v. McCracken*, 488 F.2d 406, 409 (5th Cir. 1974).  It did not require the jury to say whether it found an acquitted defendant insane; the jury just found him not guilty.  *Shannon*, 512 U.S. at 575.  It did not require civil commitment for insanity acquittees; they were allowed to go free unless state authorities instituted commitment proceedings under the relevant jurisdiction's law. *Id.* at 575–76.

Two highly public trials establish the bookends of this early version of the defense, one credited for establishing it, the other for ending it.

The first trial occurred before the Civil War.  In 1859, Dan Sickles served as a congressman for New York.  *See* Allen C. Guelzo, *Gettysburg: The Last Invasion* 243 (2013).  Around that time, his wife had an affair with Philip Barton Key, the son of Francis Scott Key. *Id.* at 243–44.  When Sickles learned of the liaison, he requited Key's actions by ambushing him in Lafayette Square and fatally shooting him.  *Id.* at 244.  Murder charges followed.  At trial, Sickles told the jury that he suffered from temporary "mental unsoundness."  *Id.*  Whether

because of or in spite of his eventual reputation as "the epitome of the confidence man," the then-popular Sickles won over the jury. *Id.* The verdict declared Sickles not guilty without revealing whether the jury accepted the insanity defense. *See id.*; Russell Fowler, *The First Case of Temporary Insanity*, 53 Tenn. Bar J. 27, 28 (2017). His liberty obtained, Sickles returned to public life after the trial, later serving as a Union general in the Civil War, losing a leg at Gettysburg and by some accounts almost losing the battle. Guelzo, *supra*, at 244–45, 275, 315–17, 327.

In 1981, more than a century later, John Hinckley, Jr., fired six shots at President Ronald Reagan, striking Reagan and three others. *Hinckley v. United States*, 163 F.3d 647, 648 (D.C. Cir. 1999). In response to federal charges, Hinckley invoked the insanity defense. *Id.* The burden of proving Hinckley's mental condition at the time rested with the government, and it came up short. *See id.*; *United States v. Garcia*, 94 F.3d 57, 61 & n.3 (2d Cir. 1996). Hinckley's acquittal (and the ensuing outcry) spurred Congress. *Shannon*, 512 U.S. at 577.

It passed the Insanity Defense Reform Act in 1984, overhauling the federal insanity defense. Pub. L. No. 98-473, 98 Stat. 1837, 2057 (1984); *Shannon*, 512 U.S. at 577. The Act created a special verdict of "not guilty only by reason of insanity." 18 U.S.C. § 4242(b)(3). It placed the burden of proof on the defendant to establish insanity, "an affirmative defense to be proved by the defendant by clear and convincing evidence." *Shannon*, 512 U.S. at 577; *see* 18 U.S.C. § 17.

At the same time, to "ensure[] that a federal criminal defendant found not guilty by reason of insanity will not be released onto the streets," *Frank v. United States*, 506 U.S. 932, 932 (1992) (Stevens, J., respecting denial of certiorari), Congress created a civil commitment procedure, *Shannon*, 512 U.S. at 577. The procedure embodied "a clear legislative judgment" that insanity acquittees "should be presumed dangerous." *United States v. Gutierrez*, 704 F.3d 442, 453 (5th Cir. 2013). But Congress also recognized that a mental illness diagnosis did not amount to a life sentence. It permitted acquittees to obtain release from a hospital if they could show that they were no longer a danger to the public. *See Shannon*, 512 U.S. at 577.

Section 4243 of Title 18 creates the civil-commitment framework. After an acquittal by reason of insanity, the acquitted defendant "shall be committed" for treatment. 18 U.S.C. § 4243(a). To secure release, the individual must show that his "release would not create a substantial risk" to the public. *Id.* § 4243(e); *see id.* § 4243(f). The court may impose various conditions on that release. *Id.* § 4243(f)(2). To modify or eliminate these conditions, the individual must show that such release would not "create a substantial risk" to the public. *Id.* § 4243(f). Violating those release conditions may trigger recommitment:

> The court shall, after a hearing, determine whether the person should be remanded to a suitable facility on the ground that, in light of his failure to comply with the prescribed regimen of medical, psychiatric, or psychological care or treatment, his continued release would create a substantial risk of bodily injury to another person or serious damage to property of another.

*Id.* § 4243(g).

### B.

This windup brings us to the salient pitch: Does Williams bear the burden to show that his continued release would not "create a substantial risk" to the public under § 4243's revocation procedure? *Id.* Section 4243(g)'s text, examined in isolation, does not say one way or another. But several clues show that the burden rests with Williams.

Confronted with § 4243's silence, we "begin with the ordinary default rule" in this setting. *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 56 (2005). That default here arises from § 4243's link to the affirmative defense of insanity. The burden of proving affirmative defenses rests with the defendant. *Patterson v. New York*, 432 U.S. 197, 202 (1977). That reality stretches from criminal law to civil law, and from Blackstone to the present. *Dixon v. United States*, 548 U.S. 1, 8 (2006) (citing 4 William Blackstone, *Commentaries* *201); *Schaffer*, 546 U.S. at 57. "[W]e presume that Congress intended to preserve [that] common-law rule," absent some reason to think otherwise. *Smith v. United States*, 568 U.S. 106, 112 (2013). Section § 4243 does not provide such a reason. It instead incorporates this default rule.

Consider how the statute operates in practice. At the outset of the criminal case, the individual bears the burden to show he is entitled to the insanity defense. 18 U.S.C. § 17(b). To

carry that initial burden, he must prove by clear and convincing evidence that he is not guilty because he "was unable to appreciate the nature and quality or the wrongfulness of his acts" due to "a severe mental disease or defect." *Id.* § 17(a).

Successfully invoking the defense at trial comes with after-the-trial consequences. The Insanity Defense Reform Act makes "clear" that acquittees "should be presumed dangerous rather than not dangerous." *Gutierrez*, 704 F.3d at 453. "It comports with common sense," the Supreme Court has explained, "to conclude that someone whose mental illness was sufficient to lead him to commit a criminal act is likely to remain ill and in need of treatment." *Jones v. United States*, 463 U.S. 354, 366 (1983) (discussing Congress's civil commitment scheme for the District of Columbia). Consistent with that reality, "[a] finding of insanity shifts the burden from the [g]overnment to the insanity acquittee, who must prove that he is *not* dangerous before he may be released." *United States v. Mikulich*, 732 F.3d 692, 700 (6th Cir. 2013). That presumption endures until an individual's final release.

Section 4243's commitment procedure carries forward that presumption, placing the burden of proof on the individual from beginning to end. After a verdict of not guilty by reason of insanity, § 4243 requires the individual's immediate commitment. 18 U.S.C. § 4243(a). At a hearing held no later than forty days later, the individual may seek release. But to receive it he "has the burden of proving . . . that his release would not create a substantial risk" to persons or property. *Id.* § 4243(d). If the defendant fails to make that showing "by the [burden of proof] specified in subsection (d)," the Attorney General or the relevant State will take custody of him for placement in a facility. *Id.* § 4243(e). Once an acquitted defendant is committed to a suitable facility, he bears the burden of showing "by the standard specified in subsection (d)" that his condition has improved to the point that his release "would no longer create a substantial risk." *Id.* § 4243(f). If the acquitted defendant secures a conditional release, he carries the burden "after a hearing employing the same criteria" to "modify or eliminate" the conditions of release. *Id.* All told, the individual retains the burden at each relevant turn.

At issue here is the "revocation of conditional discharge," provided for in § 4243(g), which could happen at any point after a conditional release. It occurs when there is probable cause to believe that a conditionally released individual broke the conditions that were designed

to ensure that he did not endanger the community. *See id.* The provision, to be sure, does not specify that the § 4243(d) "burden of proof" applies to every feature of a revocation case. But there is a good reason for the silence. That burden of proof does not in fact apply to the key feature of a revocation. The government bears the initial burden of establishing a violation, as with any supervised-release violation. *See, e.g.*, *United States v. Bates*, 804 F. App'x 345, 346, 351 (6th Cir. 2020) (reasoning that the government failed to establish a violation of supervised release); 18 U.S.C. § 3583(e)(3). Only after a violation has been established does the court hold a hearing to determine whether "continued release would create a substantial risk" to the public. 18 U.S.C. § 4243(g). At that point, the customary burden of proof, incorporated throughout, kicks in. Just as the individual has the burden at every turn up to that point to show he is not a risk to the public (for the affirmative defense, for initial release, for release after a period of commitment, for modification of conditions of release, and for ultimate release), so the individual also has the burden when the same issue returns after a violation of the conditions of release. *Cf. Schaffer*, 546 U.S. at 58 (presuming that "that the burden of persuasion lies where it usually falls").

The interaction between § 4243(f) and (g) reinforces this conclusion. At his § 4243(f) hearing, Williams faced two potential paths for obtaining release. He could show that he was safe for release, full stop. 18 U.S.C. § 4243(f)(1). Or he could show that he was safe for release "under" specified conditions. *Id.* § 4243(f)(2). Williams took the second path. By the time of § 4243(g)'s revocation hearing, however, Williams was not "under" those conditions. He broke them. That reality returned him to the original choice of paths. He could either show that he was safe without any binding conditions or persuade a once-bitten, perhaps-shy court that he would keep his promises. Either way, his burden at the § 4243(g) hearing was no lighter than before.

Any other approach would make a hash of the system. Williams initially showed that his release would not "create a substantial risk" to the public "under" the various court-imposed conditions. *Id.* § 4243(f)(2). To eliminate or modify those conditions, Williams had to meet his burden again, showing that he was safe without them. *Id.* It follows that the same burden applied under § 4243(g) when Williams effectively modified or eliminated the conditions of his release by violating them. Rarely does the law give more favorable treatment to those who seek

forgiveness than to those who ask permission. Else, the statute would incentivize individuals to violate onerous conditions rather than seek to relax them. *Cf. Sealed Appellee v. Sealed Appellant*, 665 F.3d 620, 622–23 (5th Cir. 2011) (concluding for similar reasons that the burdens for § 4246's modification and revocation provisions must match).

The § 4243(g) revocation hearing, it bears adding, has several siblings in the U.S. Code that operate in a similar fashion. Consider another statute, also enacted in 1984, that deals with related public-safety considerations. Courts may release a convicted defendant on bail while he awaits sentencing or an appellate ruling. 18 U.S.C. § 3143. To order release, a court must find "by clear and convincing evidence" that the person does not "pose a danger to the safety of any other person or the community." *Id.* § 3143(a). Courts have concluded that § 3143 places the burden on the defendant because the section "presumes dangerousness" and requires that he "overcome this presumption." *United States v. Vance*, 851 F.2d 166, 168 (6th Cir. 1988); *see United States v. Chilingirian*, 280 F.3d 704, 709 (6th Cir. 2002). In the same way, § 4243 reflects a presumption that individuals acquitted on the basis of insanity pose a continuing danger to the public until they prove otherwise. *Gutierrez*, 704 F.3d at 453. In each case, the law "shifts the burden" to the individual to "prove that he is *not* dangerous." *Mikulich*, 732 F.3d at 700.

The opposite presumption by the way applies before a finding of guilt. That explains why the government ordinarily bears the burden of showing that an arrestee should be detained before trial. *United States v. Salerno*, 481 U.S. 739, 750 (1987). And it explains why the government bears the burden for civil commitment of a defendant found incompetent to stand trial. *Gutierrez*, 704 F.3d at 453 (discussing commitment under 18 U.S.C. §§ 4241, 4246). All that changes when an individual proves his insanity or the government otherwise proves him a danger. *Jones*, 463 U.S. at 366–70. From then on, the individual must prove "that his release would *not* create a substantial risk to others." *Gutierrez*, 704 F.3d at 453.

Comparing § 4243 and § 4246 illustrates the point. Using nearly identical language, both sections describe the civil commitment process for individuals who may pose a danger due to a mental health condition. Section 4246 provides for initial commitment, conditional release, release revocation, and unconditional release—much like § 4243. *See* 18 U.S.C. §§ 4243, 4246. Section 4246 typically applies to defendants found incompetent to stand trial. *See id.* §§ 4241,

4246(a). The government, it follows, bears the burden of showing that such a person poses a danger, just as it would otherwise bear the burden of showing guilt. Because § 4246 provides no reason to shift that burden for revocation, courts have held that the government bears the burden there too. *See United States v. Perkins*, 67 F.4th 583, 638 (4th Cir. 2023). Section 4243, by contrast, applies only to those defendants who prove the insanity defense. 18 U.S.C. § 4243(a). Incorporating the common-law default on affirmative defenses, *see Smith*, 568 U.S. at 112, the ensuing commitment process places the burden on the individual at several points. As with § 4246, the silence on the burden for revocation proceedings suggests that "the burden of persuasion lies where it usually falls." *Schaffer*, 546 U.S. at 58.

Another section of Title 18 suggests a similar conclusion. Section 4248 allows a court to send "a sexually dangerous person" to civil confinement, release that person under conditions, and later revoke that release. 18 U.S.C. § 4248(a), (d)–(f). Courts agree that the initial burden to prove an individual "sexually dangerous" lies with the government and that, once it has done so, the burden shifts to the individual to show that he is safe for release. *Cf. United States v. Wetmore*, 812 F.3d 245, 247–48 (1st Cir. 2016) (discussing release); *United States v. Barrett*, 691 F. App'x 754, 755 (4th Cir. 2017) (per curiam) (same). Just so with § 4243(g).

Williams seeks to counter this conclusion by invoking the negative-implication canon. Pointing to the provisions that expressly place the burden of proof on the individual, Williams contends that Congress's silence in § 4243(g) shows that it intended to flip the burden to the government. But the import of silence often turns on "background presumptions" and "context." *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 381 (2013). Neither one favors Williams. The background presumption—Congress's "clear legislative judgment" that an insanity acquittee poses a danger, *Gutierrez*, 704 F.3d at 453—cuts against the argument. Once the individual breaks the conditions of release, he returns to that presumption. The consistent context and structure—Congress's specification that an individual bears the burden for trial, for initial release, for release on conditions, for modifying conditions, and for release without conditions—cuts against the argument as well. So too does the contextual reality that the government bears the initial burden of showing a condition-of-release violation, which explains why Congress would not reflexively incorporate the burden of proof provision into the section in the first place.

Williams separately alludes to the rule of lenity, by which we construe ambiguities in criminal laws in favor of the defendant. Leave to the side that § 4243 is not a criminal statute. Either way, the rule of lenity does not apply until all tools of construction have been invoked, and only then when a "grievous ambiguity" emerges. *Ocasio v. United States*, 578 U.S. 282, 295 n.8 (2016) (quotation omitted); *see also United States ex rel. Martin v. Hathaway*, 63 F.4th 1043, 1050 (6th Cir. 2023) (applying lenity when a single statute "creates civil *and* criminal liability"). That did not happen here. The "long-established common-law rule" that individuals bear the burden on affirmative defenses, buttressed by context, leaves this statute far from ambiguous. *Dixon*, 548 U.S. at 14; *see Schaffer*, 546 U.S. at 57–58; *see also* William Baude, *The 2023 Scalia Lecture: Beyond Textualism?* 46 Harvard J.L. Pub. Pol'y (forthcoming 2023) (manuscript at *15) (discussing the role of "unwritten law as a backdrop against which to read legal texts").

Two more points on this score. Williams disputes the burden's location, but he does not dispute its weight. Because he does not take issue with the district court's application of the clear and convincing evidence standard, we assume that it applies. *See* 18 U.S.C. § 4243(d) (correlating the nature of the offense with the burden's weight); *see also Perkins*, 67 F.4th at 615 (applying a preponderance standard for revocation of conditional release under § 4246(f)). Neither Williams nor the government address the "should" language in § 4243(g) and how an abuse-of-discretion standard works in this setting. *See United States v. Rogers*, 14 F. App'x 303, 305 (6th Cir. 2001) (per curiam).

III.

*Substantial risk to the public.* With the burden allocated, we turn to application. Did the court err in finding that Williams failed to show that he did not pose a risk to the public?

To revoke Williams's release under § 4243(g), the district court had to find (1) that he violated the release conditions, and (2) that "his continued release would create a substantial risk" to the public. 18 U.S.C. § 4243(g). Williams concedes that he violated the conditions, contesting only the risk he posed to the public. Lacking the court's face-to-face contact with Williams and its front-row seat at the hearing, we review the risk finding for clear error and the court's ultimate decision on revocation for an abuse of discretion. *Rogers*, 14 F. App'x at 305,

307; *see United States v. Beatty*, 642 F.3d 514, 517 (6th Cir. 2011) (reviewing a finding of danger under § 4243 for clear error).  The parties accept this standard of review.

The court permissibly found that Williams presented a substantial risk to the community, as his behavior and mental condition show.  Start with his behavior.  Section § 4243(g) instructs courts to consider revocation of a person's release "in light of his failure to comply" with the release conditions.  That light does not flatter Williams.  In the court's words, he "repeatedly . . . fail[ed] to adhere" to his treatment regimen.  R.143 at 36.  Those violations permit the court to conclude that Williams would again refuse to comply and that "danger to the community" would follow.  *Rogers*, 14 F. App'x at 305; *see United States v. Washington*, 764 F.3d 491, 499 (5th Cir. 2014) (emphasizing "the extent" of noncompliance).  Williams also exhibited his potential for violence through threats against family members and arrests for crimes such as aggravated assault.  *See Rogers*, 14 F. App'x at 306 (threats support revocation).

Pivot to Williams's mental condition.  The mental-health experts found that Williams suffered from severe mental illness, which produced "aggressive, impulsive, and threatening behavior."  R.132 at 36.  He fixated on his brush invention and held to the view that Boucherie wronged him.  He also dismissed his need for medication and derided the conditions on his release.  *See United States v. Mitchell*, 709 F.3d 436, 443 (5th Cir. 2013) (noting that an individual "no longer wished to participate in" treatment to support revocation).  No less concerning, Williams "expressed ambivalence about his ability to refrain from [threatening behavior]."  R.132 at 29.  All of this, the report concluded, rendered it "likely" that Williams would again disregard his treatment regimen and endanger himself and others.  *Id.* at 35–37; *see United States v. Ambers*, 360 F. App'x 39, 43 (11th Cir. 2010) (per curiam) (finding it relevant that acquittee had a "propensity for violence" without medication).

Williams offered little proof to the contrary at the hearing.  Other than a brief cross-examination of a probation officer, Williams presented no evidence at all.  With such a lopsided record, the court did not err, let alone clearly err, in finding that Williams posed "a substantial risk" to the public.  18 U.S.C. § 4243(g).

Williams faults the government's evidence, saying it lacks "objective" indicia of a danger. Appellant's Br. 9. But that is not the case. The court relied on testimony, a psychological assessment report, and records of Williams's behavior. Courts customarily employ such evidence. *See Rogers*, 14 F. App'x at 306 (affirming use of witness testimony); *Mitchell*, 709 F.3d at 443 (psychiatric reports); *United States v. Stewart*, 452 F.3d 266, 274 (3d Cir. 2006) (records of noncompliance).

Williams claims that he has not "committed a violent act[] or threatened one" within the last twenty years. Appellant's Br. 14. But that understates the record in the first place. Williams acted "aggressively . . . within the recent past," R.132 at 34–35, and he made threats within that period. And the argument does not make a difference in the second place. Williams's continued mental health issues, his recent violations of the release conditions, and his "resistance to treatment efforts" all gave the court ample reason to find that he presented a substantial risk to the public. *United States v. McFinley*, No. 18-3028, 2018 U.S. App. Lexis 13095, at *3–4 (6th Cir. 2018) (per curiam) (order) (rejecting an identical argument).

Rather than civil commitment, Williams suggests that the court should have permitted him to live at his mother's house. But that is not a risk-free option. Williams's mother likely lacks the ability to monitor Williams, as she suffers from cancer and dementia. Even sound supervision would not eliminate the risk of harm in the home itself. Williams wrote notes that referenced killing his mother, and his sister expressed "concern[]" for her mother's "safety" around Williams. R.132 at 33. The court did not abuse its discretion by rejecting this alternative.

We affirm.